1  Law Office of Adam Pennella
   Adam Pennella, State Bar No. 246260
2  420 Third Street, Suite 250
   Oakland, CA 94607
3  Phone (510) 451-4600
   Fax (510) 451-3002
4
   Counsel for Defendant
5  FREDDIE LEE DAVIS III

6
                    UNITED STATES DISTRICT COURT
7                  NOTHERN DISTRICT OF CALIFORNIA
                        OAKLAND DIVISION
8
   UNITED STATES OF AMERICA,              Case No.: CR 24-406 YGR
9
               Plaintiff,
10                                        **DEFENDANT'S SENTENCING
                                          MEMORANDUM**
11        vs.

12 FREDDIE LEE DAVIS III,                 Date:  October 24, 2024
                                          Time: 2:00 p.m.
13            Defendant                   Honorable Yvonne Gonzalez Rogers

14       Defendant Freddie Lee Davis III respectfully submits the following sentencing

15 memorandum.

16                             **<u>INTRODUCTION</u>**

17       Mr. Davis has accepted responsibility and pleaded guilty to wire fraud and aggravated

18 identity theft based on using a stolen credit card with his co-defendant, Sene Malepeai. Mr.

19 Davis and the government agreed to the terms of a plea agreement pursuant to Rule 11(c)(1)(C)

20 in which Mr. Davis would be sentenced to 1 day on the wire fraud charge and 2 years

21 consecutive for the aggravated identity theft. He respectfully requests that the Court accept the

22 terms of the plea agreement and impose that sentence, as it is sufficient punishment for his

23 conduct, taking into account his background and history.

24

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE                    1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## PROBATION REPORT AND RECOMMENDATION; OBJECTIONS

U.S. Probation Officer Khaminh Huynh prepared a thorough Presentence Investigation Report (PSR) in this matter. There are no Guidelines or factual objections to the content, only to one proposed term of supervised release – that Mr. Davis have no contact with any codefendant in this case, namely Sene Malepeai – as that condition is inappropriate and unnecessary under the circumstances (discussed below). The only other further objection is that restitution be reserved and the ultimate amount of restitution determined based on a complete record of a victim's actual losses (also discussed below).

## PERSONAL HISTORY AND CHARACTERISTICS

The PSR discusses Mr. Davis's background. He has a good relationship with his family, who are supportive and will be present and active in assisting with his reentry into the community. He was raised with and around numerous family members, siblings, and foster siblings. He grew up poor with periods of housing instability, including living in a homeless shelter. This pattern continued until he was about 10 years old, when they settled in Oakley, and he had some consistency. He attended school, although the academics presented significant difficulties given his cognitive issues (discussed below). However, he excelled in and enjoyed playing sports, particularly football. He is described as a mild mannered, quiet, and a well-behaved youth, although not terribly social, often staying to himself.

After graduating from high school, he attended classes at Laney and Chabot College and played football. He never obtained any degree or certificate. He also worked, pretty much consistently since he has been in high school, with the only real gap in employment occurring during the pandemic and near in time to the underlying offense conduct. Indeed, he remained employed until remanded into custody in the underlying case in 2023.

1   He has been in a relationship with his co-defendant, Ms. Malepeai for several years, and

2   the two have a daughter (age 3) and a son (8 months old) together. Mr. Davis has a close

3   relationship with his daughter, who he is very eager to see. He has never met his son, as he was

4   born while Mr. Davis was in custody for this case.

5   He and Ms. Malepeai were involved in a juvenile dependency case that began in 2021

6   and led to court-ordered reunification services. The reunification plan required Mr. Davis to

7   participate in individual counseling, parenting education, a domestic violence class, all of which

8   he completed. (See attached Ex A, letters and documents related to Mr. Davis's dependency

9   case, filed under seal). Indeed, Mr. Davis was particularly engaged in the fatherhood group he

10  attended, both looking for help from, and assisting his, peers in the class. San Francisco's

11  Protective Services Worker speaks even more highly of Mr. Davis's efforts and engagement,

12  summarizing the work he did, the progress made, and the genuine connection he has with his

13  daughter.

14  Given that progress, on July 11, 2023, shortly before the charges were filed in this case,

15  the juvenile court ordered that their daughter be immediately retuned to the home of Mr. Davis

16  and Ms. Malepeai, noting that they had made significant progress in resolving the problems that

17  led to the case. While the family continued to be under the supervision of Children and Family

18  Services, joint custody was maintained and no issues were raised. In short, there was progress,

19  and Mr. Davis was actively engaged in the necessary work. Indeed, that work continued after

20  Mr. Davis was remanded into custody in this case. Then on January 23, 2024, the juvenile court

21  dismissed the case with joint legal and physical custody awarded to Mr. Davis and Ms.

22  Malepeai.

23  //

24

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE        3

1    <u>Mr. Davis's Cognitive Issues</u>

2    Mr. Davis was evaluated by an educational psychologist, Dr. Arleen Conradi, who

3    conducted an interview of him and reviewed several records, including Individualized Education

4    Plan ("IEP") documentation from when he was six until he graduated high school. Her report,

5    attached hereto, documents Mr. Davis's cognitive limitations. (See Ex B, Psychoeducational

6    Evaluation Report from Arleen Conradi, filed under seal). He has a full-scale IQ score of 76,

7    which places him in the bottom 5th percentile, and is just on the border of being considered

8    intellectually disabled. For reference, an IQ below 70 is considered intellectually disabled

9    (previously referred to as mental retardation).[1] His verbal skills testing was even lower, in the

10    2nd percentile, which is in the "low range, indicating significant weakness with his verbal

11    comprehension and reasoning skills." (See Report at 5).

12    Her report documents two learning disorders, impacting both reading and writing, which

13    includes "persistent deficits in comprehension or production of language." (See Report at 10).

14    She notes that he "presents with significant deficits in verbal reasoning/comprehension skills, as

15    well as weakness with working memory." These challenges require written material to not only

16    be explained, but he "needs important information to be repeated to ensure it was processed, and

17    he should be asked to repeat new information in order to check for encoding and understanding."

18    She recommends that, given his "difficulty comprehending high vocabulary and verbal

19    information," he needs "oral communication that is individualized and features the following

20    elements: 1) use of clear, concise language; 2) use of vocabulary that is comprehensible; 3) use

21

22

23

24

---

[1] See *Mental Disorders and Disabilities Among Low-Income Children*, Committee to Evaluate the Supplemental Security Income Disability Program for Children with Mental Disorders; Board on the Health of Select Populations; Board on Children, Youth, and Families; Institute of Medicine; Division of Behavioral and Social Sciences and Education; The National Academies of Sciences, Engineering, and Medicine; Boat TF, Wu JT, editors. Mental Disorders and Disabilities Among Low-Income Children. Washington (DC): National Academies Press (US); 2015 Oct 28. 9, Clinical Characteristics of Intellectual Disabilities. Available from: https://www.ncbi.nlm.nih.gov/books/NBK332877/ /

of pause[s] between phrases or sentences to promote processing of information; 4) avoidance of complex and lengthy sentences; and 5) checking comprehension after the communication is completed."

These deficits are illustrated in his IEP notes, describing the challenges he faced throughout his school years: Mr. Davis "struggled in both reading fluency and reading comprehension skills;" he "struggles with applied problems due to reading struggles and difficulty;" "significant expressive and receptive language delay requiring speech-language services;" "Freddie continues to score below grade level in reading," operating at about a 7th-8th grade level at the time of his graduation. From a behavioral perspective, however, he was described as "polite, hardworking, and respectful," although having "difficulty maintaining focus" and "may exhibit a lack of motivation to complete assignments."

This is important, not only so that this Court has a better understanding of Mr. Davis and any issue he presents, but it should be considered in context of his bail violation and the meaning and significance assigned to it. He had just been in the context of family court proceedings for two years where the focus was on reunification with family. He was in groups focused on parental education, raising his child in a healthy way, domestic violence, communication, etc.; the entire focus and message from counselors to lawyers to judges to children and family services workers was to focus on family with the goal of reunification. That sends a very clear message to him on what he should focus on: learning and using the skills to be good and positive parent and partner.

Moreover, this history, as well as his cognitive issues, are also important for the Court to understand when considering conditions of supervised release and what makes practical sense in the backdrop of this family dynamic (discussed below). Finally, this is particularly critical for

1  Probation to understand for when he is on supervision: we all know that sometimes people nod

2  and say they understand when perhaps some things are not entirely clear. It is important that

3  Probation understand his history, and seek to utilize Dr. Conradi's practical recommendations

4  about communication so that he is most successful on supervision.

5  ## SENTENCING CONSIDERATIONS

6  In determining a reasonable and appropriate sentence, the Court must consider those

7  factors set forth in 18 U.S.C. 3553(a), including the nature and circumstances of the offense and

8  the history and characteristics of the defendant.  The Guidelines are advisory, *Gall v. United*

9  *States*, 552 U.S. 38, 46-47 (2007), and there is no presumption in favor of a Guidelines'

10  calculation. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (citation omitted) ("Our cases do

11  not allow a sentencing court to presume that a sentence within the applicable Guidelines range is

12  reasonable. In *Rita* we said as much, in fairly explicit terms: "'[T]he sentencing court does not

13  enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'"). The

14  District Court is thus not required to use a formulaic approach to produce a mathematical

15  justification for a non-Guidelines sentence.  *Gall*, 128 S.Ct at 596.  Rather, it must exercise a

16  "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice

17  through § 3553(a)'s list of factors.  *Rita v. United States*, 127 S. Ct. 2456, 2469 (2007).

18  When this Court applies the section 3553(a) factors to Mr. Davis, the following

19  circumstances demonstrate that the jointly recommended sentence is sufficient: (1) the total

20  exposure stemming from the mandatory minimum sentence in this case provides more than

21  sufficient punishment; (2) Mr. Davis's diminished mental capacity, including his cognitive

22  issues, reduces his relative culpability (3) any sentence greater than the one agreed to by the

23  parties and recommended by Probation would result in inappropriate sentencing disparity.

24

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE                    6

1    **A. This Court can, and should, consider the effect of the mandatory minimum when
2    fashioning a sentence that is sufficient, but not greater than necessary to comport
     with the requirements of § 3553.**

3    When a defendant faces a mandatory minimum on another count, the district court may

4    consider the total exposure to incarceration and reduce the sentence on the other counts to

5    account for the mandatory minimum. See *U.S. v. Webster*, 54 F.3d 1, 4 ("in departing from a

6    guideline sentence the district court is free to exercise its own judgment as to the pertinence, if

7    any, of a related mandatory consecutive sentence."); see also *U.S. v. Smith*, 756 F.3d 1179, 1192

8    (10th Cir. 2014) (a district court may find the length of a § 924(c) sentence relevant to the

9    sentencing factors Congress has explicitly directed it to consider when sentencing for an

10   underlying crime.). Here, Mr. Davis faces a mandatory 24-month sentence on the 1028A charge

11   alone; that fact is one this Court can, and should, consider when deciding the ultimate sentence,

12   and the bottom end of the Guidelines range on the wire fraud charge.

13   For this reason, the agreed upon recommendation by the parties is reasonable and

14   appropriate.

15   **B. Mr. Davis's diminished mental capacity (I.Q. of 75) reduces his relative culpability**

16   The United States Supreme Court has recognized that "impaired intellectual functioning

17   is inherently mitigating." *Tennard v. Dretke*, 542 U.S. 274, 285-86 (2004). Persons who "have

18   diminished capacities to understand and process information, to communicate, to abstract from

19   mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to

20   understand the reactions of others…often act on impulse rather than pursuant to a premeditated

21   plan, and…are followers rather than leaders. Their deficiencies do not warrant an exemption

22   from criminal sanctions, but they do diminish their personal culpability." *Atkins v. Virginia*, 536

23   U.S. 304, 318 (2002).

24

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE                    7

1     Federal courts appropriately consider borderline intelligence as a mitigating

2 circumstance that justifies a variance or downward departure. *See, e.g.*, *United States v. Cotto*,

3 793 F. Supp. 64, 65 (E.D.N.Y. 1992) (citing defendant's I.Q. of 71 to vary downward in Hobbs

4 Act robbery case involving a conspiracy to rob an armored van); *United States v. Chambers*, 885

5 F. Supp. 12, 14 (D.D.C. 1995) (relying on diagnosis of defendant "as functioning at the

6 borderline mental defective level of intelligence" to vary downward from 188-235 months to 21

7 months where defendant agreed to allow a drug dealer to store crack cocaine in her apartment)*;*

8 *United States v. Ferguson*, 942 F.Supp.2d 1186 (M.D. Ala. 2013) (citing defendant's I.Q. of 79

9 and untreated mental illness to vary downward and impose sentence of probation).

10     In *Chambers*, the district court described the defendant as "borderline retarded" because

11 of her I.Q. of 71 and concluded her diminished cognitive capacity contributed to her decision to

12 agree to allow her apartment to be used to store crack cocaine. 885 F. Supp. at 14.  In making

13 this conclusion, the district court relied on and credited the defense expert's opinion that the

14     Defendant is "significantly impaired in the area of executive functioning" and it is
       "unclear as to what extent she is really capable of exercising sound judgment." . . .

15     "[Defendant] might know that a particular course of action would affect her adversely
       and yet not be able to formulate and maintain an alternative course of action over an

16     extended period of time without external supports."

17 *Id.* In *Ferguson*, the district court varied downward, even though the defendant "knew that what

18 she was doing was wrong," because "her borderline-impaired intellectual capacity [I.Q. of 79]"

19 meant she could not have orchestrated the fraudulent scheme on her own and caused her to be

20 "particularly vulnerable to the manipulation and coercion of more sophisticated criminal actors."

21 942 F.Supp.2d at 1194. In *Cotto*, the district court worried that a defendant of borderline

22 intelligence (I.Q. of 71) was "likely to be preyed upon" in prison, notwithstanding the fact that

23 the offense of conviction was Hobbs Act robbery targeting an armored car. 793 F. Supp. at 67.

24

1    Similarly, Mr. Davis's cognitive issues are mitigating. When considering the conduct

2  that is *actually charged* and for which Mr. Davis was convicted, there is nothing complex about

3  it: he and Ms. Malepeai jointly used a stolen credit card to buy items. This is different from the

4  typical case in which the aggravated identity theft is charged. And when considering the record

5  related to the robbery, the record and investigation suggests that this *modus operendi*, and

6  almost the incident with Q.D., was almost certainly orchestrated by E.S. and R.T., not Mr. Davis

7  or Ms. Malepeai. Nor is there a record to suggest that Mr. Davis will be involved in similar,

8  significant or complex criminal conduct in the future. Indeed, the conduct in this case occurred

9  two years prior federal charges being filed, during which Mr. Davis did not engage in similar

10 behavior. Rather, when looking at his criminal history,[2] the theme is reacting out of emotion

11 rather than planning or deliberation. That sometimes can be a reaction or response related to

12 issues of frustration, impulsivity, and effective and productive comprehension and

13 communication. Importantly, Mr. Davis he has shown a willingness and ability to work on those

14 issues, as demonstrated by his extensive work as part of the dependency case. (See generally Ex.

15 A).

16    In short, Mr. Davis's intellectual functioning is a mitigating factor that the Court should

17 consider. The jointly agreed to sentence, supported by Probation, is sufficient in this case.

18 **C. The sentence of no more two years and a day is justified to avoid unwarranted sentencing disparity**

19

20    Mr. Davis committed the charged offenses jointly with Ms. Malepeai. While their

21 conduct is not identical, from the perspective of the federal charges, they are sufficiently equal.

22 And while there are obviously differences between the two individuals, the two defendants have

23 received significantly different treatment within the federal court. Mr. Davis was remanded to

24

---

[2] The vast majority of his criminal history noted in the PSR recites arrest reports alleging unproven conduct.

custody for violations that she also committed. She has committed other violations of release and has remained out of custody. In the end, she was offered a LEADS plea agreement that enables her to avoid imprisonment. Mr. Davis, on the other hand, has been in custody for over 13 months and is looking at a prison sentence. He is now a felon. Finding employment will be more difficult. Providing for himself and his family will be more difficult. No punishment in addition to the proposed resolution is therefore reasonable or necessary.

***

**THE COURT SHOULD REFRAIN FROM IMPOSING THE NO-CONTACT ORDER**

Probation has recommended that Mr. Davis be ordered to have no contact with his co-defendant, Ms. Malepeai, aside for exchange of their children. Mr. Davis disagrees and requests the Court allow reasonable contact between the two of them. While Mr. Davis acknowledges that the offenses were committed with Ms. Malepeai, and that there have been domestic issues between the two, Mr. Davis has legitimate reasons to be in contact with her after his sentencing. She is the mother of his two children, and they need to be able to co-parent their children, regardless of whether they choose to continue any romantic relationship or simply choose to maintain a friendship. They need to have the opportunity to discuss their children and to seek to provide a positive environment in which the children can exist. Such a court order would frustrate that goal.

It is also inappropriate because the Family Court intended Ms. Malepeai and Mr. Davis to live together during family reunification proceedings, and based on the progress in the reunification plan, awarded them joint legal and physical custody. Whether they ever live together again, implicit in the reunification plan is that the two be able to co-parent, which

requires contact and communication. This provision would inappropriately conflict with the spirit, if not the letter, of those orders.

Moreover, this no contact provision is neither mandatory, nor is it simply appropriate in all cases where two people commit a crime together. First, not every co-defendant case in this district comes with a no-contact order, including cases with extremely serious allegations. *See, e.g.*, CR 23-390-JST*, United States v. Gomez Gutierrez et al*. (co-defendant possession with intent to distribute over seven pounds of methamphetamine where the co-defendants, who are brothers, were living together at the time of the offense, without a no-contact order of any kind, Dkt. Nos. 17, 19); CR 21-187-JD, *United States v. Palermo* et al (co-defendant conspiracy to commit wire fraud/wire fraud/false statement to a bank case where the co-defendants are business partners, without a no-contact order of any kind, Dkt. No. 7); CR 14-627-SI, *United States v. Halali et al*. (co-defendant conspiracy to commit wire fraud/wire fraud/aggravated identity theft where the co-defendants were coworkers; order was only that there was to be no discussion of the case with co-defendants outside the presence of counsel, Dkt. No. 11).

*Palermo* involves allegations of over $6,000,000 in loss, as compared to perhaps as much as the $6,290.26 alleged here, as well as years of ongoing criminal activity. CR 21-187-JD. Despite those aggravating circumstances, there is not a no-contact order between the co-defendants, who have been business partners for years. *Halali* involved coworkers at an insurance agency who were accused and convicted of submitting fraudulent life insurance applications over the course of six months, and the loss was nearly $3,000,000. CR 14-627-SI. Again, there was far more ongoing criminal activity alleged, and a far higher loss amount than what is present here.

Second, the imposition of the no-contact order, in light of Ms. Malepeai's and Mr. Davis's relationship (as partners, co-parents, and co-habitants at the time of arrest) violates *Wolf Child* and *Napulou* and impermissibly interferes with their rights to associate as a family. U.S. v. Wolf Child, 699 F.3d 1082 (9th Cir. 2012). *Wolf Child* dealt with conditions in a supervised release context, where the analysis is whether the conditions are reasonably related to the goals of deterrence, protection of the public, and/or defendant rehabilitation, involve "no greater deprivation of liberty than is reasonably necessary to achieve those goals," and is consistent with pertinent policy statements issued by the Sentencing Commission. *Id.* at 1090 (citing *U.S. v. Napulou*, 593 F.3d 1041, 1044 (9th Cir. 2010)). The Court held that the condition imposed, which prevented Wolf Child from being in the company of his own daughters, was "procedurally infirm." *Id.* at 1093.

*Napulou* dealt with a ban, also in a supervised release context, of associating with a "life partner" who was a convicted felon. 593 F.3d at 1044. The Court held that the condition was overbroad because it went "beyond the standard prohibition on contact with convicted felons" and "single[d] out a person with whom the individual on supervised release ha[d] an intimate relationship." *Id.* at 1047. Both cases stand for the proposition that before imposing a condition that prevents a defendant from associating with a partner or child, a court must undertake an individualized review of that person and relationship and provide a justification for the imposition of the intrusion. *Napulou*, 593 F.3d at 1047; *Wolf Child*, 699 F.3d at 1092. In this case, with the two defendants sharing two young children, the recommended provision is overbroad and should not be ordered.

The cookie-cutter "no-contact" provision that is being recommended is simply inappropriate this case and is more extreme than it needs to be. To the extent that the Court has

1  concerns that it thinks cannot be addressed through the various other conditions of supervised

2  release, a "peaceful contact" order would be more appropriate.[3]

3                    **REQUEST FOR TEMPORARY FURLOUGH**

4         Mr. Davis requests that this Court consider a narrowly tailored, short release from

5  custody in order to meet his son before going to prison, and to see his daughter. As noted in the

6  PSR, Mr. Davis and Ms. Malepaei's 8-month-old son was born while Mr. Davis was in custody.

7  She has been precluded from visiting him at Santa Rita (and even if she were, it would be a non-

8  contact visit). Mr. Davis would very much like to meet, and hold, his infant son. He very much

9  misses his daughter as well.

10        He respectfully requests that the Court grant a request for a 24-48 hour furlough to meet

11  his son and spend time with his daughter, with an order to then surrender to the U.S. Marshals

12  thereafter. He is willing to follow any orders of this Court, such as confinement to his mother's

13  home, confirmed with a GPS monitor, and/or any other reasonable conditions.

14        **RESTITUTION SHOULD BE RESERVED BASED ON THE CURRENT RECORD**

15        In considering restitution, the district court must take into account: "(I) the amount of the

16  loss sustained by each victim as a result of the offense; and (II) the financial resources of the

17  defendant, the financial needs and earning ability of the defendant and the defendant's

18  dependents, and such other factors as the court deems appropriate." 18 U.S.C. §3663(a)(1)(B)(i).

19  "The amount of restitution under the VWPA is limited to the victim's *actual losses.*" *U.S. v.*

20  *Bussell,* 504 F.3d 956, 964 (9th Cir. 2007)(italics in original). Restitution is applicable to any

21  victim "directly and proximately harmed as a result of the commission of an offense for which

22  restitution may be ordered ...." 18 U.S.C. §3663A(a)(2).

23  ---
24  [3] Such a condition, although regularly ordered in state court is probably redundant given that the law criminalizes with specificity various types of improper contact, such as domestic battery and criminal threats. Moreover, without it being properly defined, it may also be considered vague.

Moreover, 18 U.S.C. § 3663A(d). § 3664(a) states: "The court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant."

In this case, we do not have a detailed report of the losses *actually suffered* by any victim(s), only that it could be as high as $6,290.26. For instance, there are credit card transactions that may have been reversed. Also potentially included in the proposed sum by the government are items stolen from Q.D. by E.S. – such as checks that were cashed – and there is insufficient evidence in the record to suggest that Mr. Davis is responsible for those losses. Therefore, this Court should not order restitution until a detailed breakdown is provided and the parties have a chance to argue for the appropriate amount of restitution before this Court.

## **CONCLUSION**

Given the reasons cited above, Mr. Davis respectfully requests that this Court impose the sentence agreed to by the parties and recommended by Probation, and refrain from imposing the no-contact order.

Dated: October 18, 2024                    Respectfully Submitted:


_____/s/_____
Adam Pennella
Counsel for Freddie Davis III